The third case this morning is number 23-1795, Dexcom, Inc. v. Abbott Diabetes Care, Inc. I'm sorry. 23-1540, Azuruti Pharmaceuticals, Inc. v. Alkem Laboratories Ltd. And Mr. Kahn? Correct, Your Honor. Okay. Thank you. Good morning, Your Honors. May it please the Court. I heard reference to Dr. Constantinides in the previous case, and I thought for a moment I was late for my argument because he was one of the experts in our case as well. So we'll be hearing a lot about Dr. Constantinides during argument today. So to start, the District Court's determination of obviousness and lack of written description is erroneous for multiple reasons, and we respectfully ask that it should be reversed. I'm going to start with written description. The District Court committed a legal error by misinterpreting this Court's prior authority regarding functional language that covers genus compounds. In those cases, the concern is that the functional language covers thousands or millions or billions of compounds, in part because those compounds have not been discovered and there's no adequate written description for those compounds in the specification. That's far afield from the narrow formulation claim that's at issue in this case. Here, the claims present no such concern. There is no chemical compound or undiscovered chemical compound that's perhaps within the grasp of the functional language that's at issue here. If we were to try to apply this genus species notion to our case, it seems that the species here would be parabens. And I'm going to start with what was known in the art about parabens and then turn to the specification. Let me ask you a couple of preliminary questions. I apologize because you've already kind of jumped in, but I noticed your opening brief didn't have a summary of the argument as required by our rules. Is there a particular reason why it doesn't have one? I apologize for that, Your Honor. You're right. In our mind, we thought that the introduction and the other aspects covered the summary of the argument, but upon reading the rules, I agree with Your Honor. It should have included a summary of the argument. For what it's worth, I find those very helpful often when I'm preparing. I apologize for that, Your Honor. The other thing is on the bottom of the blue brief at page 14, there's a sentence that I don't think is accurate, and I just want to ask you about it. It says the 747 patent claims required mannitol, which the patent described as a stabilizing agent, at least 50 times. I don't see it in there more than twice, and so I'm just wondering why it was stated that it was in there at least 50 times. If it's not, I didn't prepare for that, Your Honor. I apologize. I trust your reading. If it's not in there 50 times, it's in there at least twice. The important place where it's in there is the conclusion where it says that the use of mannitol as a stabilizing agent had produced better stability than the other stabilizing agents that were tested against it. Okay. Go ahead and proceed. Thank you. Turning back to the genus-species analysis, I think, if I'm applying this correctly, the district court had in mind that here, parabens are the species, and so in the prior art, parabens were known. They were known to be a preservative. They were known to be used in liquid and alkyl formulations as a preservative. There was no concern presented about the use of them in that regard at all in the prior art. Turning to the specification, the specification identifies parabens specifically as an exemplary preservative. That's column 10. In columns 6 and 12, it identifies a paraben or a mixture of parabens as an embodiment of the invention. Columns 12 and 13 disclose exemplary amounts and concentrations of parabens. The examples use a paraben or a mixture of parabens as a preservative. And so based on what was known by the skilled reader, when the skilled reader reads this specification, they would see a correlation between the content, the expressed content of the specification, and what appears in the claims themselves. And so there is adequate written description here. And what's frustrating about the district court's use of, for example, the Ariad case, which said specific examples are not required, the court used language from Ariad to then draw the conclusion that we needed to disclose more. We needed to disclose a paraben example with data. And that's exactly contrary to what this court found in Ariad. Okay, what about obviousness? Turning to obviousness, so I'm going to start with the buffer concentration limitation, Your Honor. And so the buffer concentration limitation, it was agreed at trial, Dr. Constantinides admitted, that in the prior art formulations regarding enalapril, buffer concentration was not disclosed. It was never discussed as being meaningful to stability. So to fill that hole in the evidence, what he said is he pointed to the de Villiers reference. De Villiers reference has nothing to do with enalapril. It just discusses how to create a buffer of a certain pH. And what Dr. Constantinides said is when you take those buffer amounts, you just do calculations to arrive at what the claimed buffer concentration is. But when we look at de Villiers, what it says is the amounts of ingredients that it's suggesting, what it's still going to use, produce a buffer concentration that is 15 times higher than what is claimed in the asserted claims. So because of that, there must be some evidence in the record that would motivate one of skill in the art to go from that highly elevated concentration down to the claimed buffer concentration and reduce it 15-fold. There is no testimony on that whatsoever. There's only testimony of Constantinides saying that would be an easy task, it would be routine. If you know what the pH is that you're looking for, the testimony is that you could calculate the buffer concentration, correct? Correct. And you can calculate the buffer concentration. And indeed, de Villiers did that on the face of the reference. And it said the buffer concentration they're recommending is 15 times higher than what is claimed. So there must be motivation to move from what is in that reference to the claimed buffer concentration range. And generalized testimony, conclusory testimony regarding it's an easy task, or you just calculate it, or it's routine, it doesn't provide an articulated rationale behind that motivation. It doesn't provide any facts regarding why one of skill in the art would be motivated to move to the claimed buffer concentration range. Right. There's plenty of testimony from relying on Allen and El Amari about getting a pH range of about 3, right? So that's pH range, not buffer concentration, Your Honor. Those are two separate limitations. Okay, so the buffer concentration and pH range are directly related, right? So to have a pH within a certain range, you need to have a certain buffer concentration, yes, but it is a wide range of concentrations of which we only claim a very small part of. So there must be some motivation for one of skill in the art to move from the de Villiers reference and the concentration there 15-fold down to what is in our claims in terms of buffer concentration. And that's just motivation, Your Honor. Turning to reasonable expectation of success. Again, there must be some articulated reason why one of skill in the art would combine the claim buffer concentration with the remaining structural limitations in the claim and think that achieving the claim stability was reasonable. But there's no testimony. All there is is Constantinity saying it's an easy task, it's routine. And again, that generalized testimony is not sufficient in terms of obviousness. There has to be an articulated rationale. What else is wrong with what the district court did on obviousness? So I would then turn to, even if we were to set aside all of the factual errors we pointed out in our briefing, the district court summed up the evidence on obviousness as providing a possibility that long-term stability could be achieved in a nallochrill formulation. So the sum of the evidence is at best a possibility or other place the district court says it could be achieved. One of the skill in the art thought it could be achieved. Elsewhere in the opinion, the district court uses the word hope. One of the skill in the art would hope, based on the prior art, that this could be achieved. You would do this because it could produce a useful result. You have a reasonable expectation. Could and possible and hope is not a reasonable expectation. A possibility is not a reasonable expectation, Your Honor. I respectfully submit that's discussed in some of the prior cases where if you're talking about possibilities that doesn't rise to the level of an expectation of success. But the district court found a reasonable expectation, right? In words, yes, but not in evidence. The evidence stacks up. The word could was used three or four or five times. The word possible was used. The word hope was used. That was the summation of the evidence by the district court.  Could you show me the language that you're objecting to? Certainly, Your Honor. So I would start with Appendix 27. Well, let me skip ahead. The word could appears in the bottom paragraph of 27, but I'll start at 20, Appendix 30. And it's a follow-on sentence, and it says, Dr. Konstantinides opined that these studies would have given a post of confidence that long-term stability was possible. Not that it was reasonably expected, but that it was only possible. Then we go to the next paragraph on Appendix 30. That's where the word hope appears. It's four lines down on the left. It says it would give a post of hope that a high level of stability required by the claims could be achieved. So hope and could and possible. And there are other instances of could on the next page. On Appendix 31, it says believing that long-term stability was achievable. Believing that it was achievable. That doesn't give a reasonable expectation of success. Believing something to be achievable, thinking something is possible. You're not arguing that he's applying a wrong legal standard. No, he applied the correct legal standard. What I'm saying is that the evidence... You're just quibbling with his word choice of... If he had put expectation in every time he said hope, then it would be okay. I think that's right, yeah. But he chose the word... But that sounds like a legal argument, not a factual argument. He knows what legal standard he has to make, and he's making factual findings that presumably he intends to satisfy this legal standard. Possibly that was the intent here. The legal standard, I agree, is set forth correctly in the opinion. The factual findings summarized by the district court as could and possible and achievable, that does not meet the required standard of reasonable expectation of success. It just feels like you're quibbling with his word choice because I guarantee you if we sent this back and said hope is not good enough, he's going to issue an opinion that replaces every one of those words with reasonable expectation. And that might be true, Your Honor, and that's why I think remand here is appropriate because as I pointed out on buffer concentration, there is no articulated reason on motivation or reasonable expectation when it comes to buffer concentration. And so you're right, remand for that might just get bounced back here, and I'll be making the same argument using different terms. But there is a clear hole in the evidence when it comes to obviousness, and the buffer concentration limitation is one of those places where it is very, very clear that Constantinides did not provide any facts, any reasoned articulation that would motivate one of skill in the art or lead them to expect success with the claim buffer concentration. Okay, so what else is wrong with the district court? So the other thing that stands out, Your Honor, is the district court's use of the al-Omari document as prior art. That document was never identified by any party as being relevant to obviousness. It was not identified as prior art. It did not appear on a Section 282 notice. The only time that we as Erty were aware that al-Omari was being used as a prior art reference was in the post-trial opinion. That's the very first time it was ever used as a prior art reference. So there's notice issues, there's prejudice issues, and I think it's a pretty remarkable thing for the court to do, especially when at the pretrial conference, I did make a point to make sure that the prior art references discussed in the expert reports were the only ones we were dealing with, and the district court agreed with me. But the district court relied on Allen, right? The district court did rely on Allen as well for the statement regarding pH. Is that where Your Honor is going? Yeah. So the statement regarding pH, yes, that statement appears in Allen. There's a footnote associated with it. The district court interpreted that reference to the Merck index as not having to do with pH. And one of skill in the art, and this is testified to by Dr. Constantinides, one of skill in the art, when they see that statement in Allen, would confirm it by looking at the footnoted reference. And when one of skill in the art looked at Merck and seeing nothing in there about pH. The district court said the reference wasn't about pH. And I think that's the problem. Because one of skill in the art would want corroboration for that statement in Allen. Because Allen didn't study that subject. So without any corroboration. That's a reference to other pH studies, right? It isn't just relying on the Merck index for whatever it's relying on. For that statement regarding the maximum stability of an allopril at a pH of about 3, that was citing to the Merck index, very clearly. That was not the only site, right? No, that was the only site. For that sentence, that's the only footnote, Your Honor. So in the following pages, it refers to other pH studies. There are sentences that discuss other studies that are not footnoted. A discussion of other studies, yes. Some of those studies involved smaller amounts of an allopril, but no details regarding the formulation at all. Okay. You want to save the rest of your time? Certainly, Your Honor. Mr. Kratz. Thank you. I'll take one more sip of water. I haven't spoken in a while. May it please the Court. I'd like to start first with the written description. I think that Mr. Kong gives a pretty short, shrift description of one of the cases and tries to describe the case as requiring some sort of genus species analysis. And that's just not the laws that's developed in the Federal Circuit. Can I start by asking you a written description question, actually, on this topic? Because I'm having a hard time. I'm looking at Column 18, Line 64, to Column 19, Line 2, and I'm having a hard time understanding why that isn't providing sufficient written description support. And the reason is because the claims are functional claims. The claims are not just... Did you look at the part that I was citing to? I mean, that part I'm citing to refers, addresses the functional limitation in the claim. And so I'm having a hard time understanding why it's not satisfied. It says it talks about stability for at least 12 months. It says that the liquid formulations described herein are stable for at least 12 months. But with respect to the paraben formulations, they have nothing. So you don't think that the specification when it says oral liquid formulations described herein, it's not including the paraben formulations? Why not? It doesn't, for two reasons. One is they didn't do anything to confirm that the paraben formulations could have any stability whatsoever. You're saying there's no examples, but now there's case law that very clearly says, ARIAD, says you don't have to have examples. You're just looking at for written description. It seems to me you're arguing enablement. You're arguing that it wouldn't be capable of satisfying the functional limitation. Don't interrupt me, please. I apologize. Not that the four corners of the document doesn't say that it does so. Those are two different things. And I'm giving you my question because I want to hear your best response. I think they can prove enablement. I don't think they have written description for the reason that they did not possess the invention that involved parabens. They actually disclaimed it. And because they don't have any statements in there that a paraben formulation could meet those functional claims. So in your view, it's not sufficient that it says, The formulations described herein are state before and then in the refrigerated condition. That somehow I'm supposed to read that as meaning only some of the formulations satisfy or intended to satisfy the functional language. Because that's all they really invented. Because there's no example. What is your argument besides the fact that there's no example? There could be other things in there. I don't know. But they don't have anything. And with the inventor testimony, which is relevant to distinguish what isn't invented under the Nouveau Farms case, they expressly said they didn't do it. I thought that what he said was that in regards to enablement, a person of ordinary skill in the art would be able to perform the stability tests with the paraben formulation and show that it satisfied the 12 months. I thought that's what he said. And I think that's an admission that there's no written description, which presents a completely different question. Now, where he says that there's no written description, where he says, I don't possess this invention. He says that. Where does he say I don't possess this invention? There's no written description. He's quite clearly says that with respect to the single paraben formulation, which is claimed in those claims. You want to give me an appendix? Yeah. He's just saying one paraben isn't enough. He says that I don't think it would work using a single paraben. Yeah. But that's not what's claimed. So I didn't do it. And that was his explanation for not doing it. But yet they claim it. They quite clearly claim a single paraben formulation. He says that. Appendix 2986, where he says that he would not do it. He had no expectation that paraben could be substituted for sodium benzoate. Now, they invented the sodium benzoate formulation. They probably enabled other formulations because it is a matter of routine experimentation. It is a matter of ultimately what ultimately becomes obvious to be able to do this. You just tinker with it and you come up with it. But they didn't do it with single paraben, yet they claim it all. And that's what the problem that the court had with this, is that they did not claim or they're claiming too much. They don't practice this invention, these claims. They never invented it. They never put it together. They never tested it. They don't have any information. We're running out of time here. Jim still has other questions about written description. Let's move on to obviousness. Okay. And you've heard. There's a scatter shot. Mr. Kahn's three or four points about the opinion. Could you address those, please? I'll address each one as we talk about it. From a broad observation standpoint, I want to say that the judge absolutely knew. Let's skip the broad observations and go on to specific objections. Okay. So the buffer concentration, he relies on Dr. Little or Dr. Konstantinidis, who testified that this is a matter of routine experimentation. It could be optimized quite easily. Dr. Konstantinidis refers to de Villiers as an example of this ability to testify. There's some tables in de Villiers that they take issues to. But de Villiers itself also says you could dilute it. And so it's a matter of simply figuring it out what to do. Importantly, Dr. Little, their experts, says nothing about buffer concentration. They're not talking about this as a novel part of this invention at all. They just said, well, you didn't check off that box. But we did. And the court, applying the correct standards, listened to Dr. Konstantinidis and believed it. They don't like that that's what happened here. And the credibility determinations between these two experts is such that Judge Goldberg agreed with our expert that this was a matter of routine experimentation and it would be easily done. And that's a common theme. That's why I wanted to start with a common theme. But particularly with respect to the buffer concentration, you don't have to find the specific thing in the art. All of these things, all of the ingredients, the functionality of this invention are all found in the prior art. It's all agreed to. The question is, how easy would it be to put together? And Dr. Konstantinidis quite clearly testified, and the court quite clearly absorbed the fact that this would be something that would be easy to do. And, in fact, they rely on that for enablement. Because this isn't part of the invention. This isn't what they did. They just did. What about the reliance on Al-Omari? Al-Omari, first of all, was entered into evidence without any objection whatsoever. It was introduced during our case on non-infringement. It was described and it was introduced on non-infringement. The court does refer to Al-Omari in the obviousness section. It is prior art. It was produced to them in the case, so their idea that they're surprised by this is unavailing. And the fact is that it wasn't the only reference that was used to put the point. Because Allen was used in the pH, and Dr. Konstantinidis testified in general with respect to the art, and also with respect to the court picked up with what Al-Omari talked about. And it's not an error to use this as an unobjective piece of prior art. And if you look at where the court referred to Al-Omari, time and again, he's talking about background art, what was generally understood by a person of ordinary skill in art. So there's not an error for them to accept this as evidence. It was introduced as evidence without objection. It's not error for them, for the court, to refer to Al-Omari as part of the fabric of what was known, because Dr. Konstantinidis quite clearly testified as to what was known in the art and how easy it would be to put together. Okay, how about the footnote to the Burke reference? So that's with respect to the Allen reference. The Allen reference states that the enolapyl is most stable at the particular pH level, but the sentence contained other pieces of information about enolapyl. The footnote, which referenced the Merck index, was a reference for the other pieces of information in that sentence. And so it's not an error to cite the footnote. So it wasn't a typographical error. It wasn't an error. But it's a statement that was in the Allen reference as to the stability of the drug at the particular pH. Allen is a peer-reviewed article, and it was admitted into evidence, and it was relied upon by all of the experts in this case. The court can refer to the body of the thing. They're trying to impose some sort of standard that it has to be supported by the footnote, where it just doesn't. The fact is that that Allen reference says that it was most stable at 3.2, and Dr. Kansenitis testified as to what would it pose to do with that. And so they would say, I'd target 3.2. Well, that's a pretty obvious thing to do, and the fact that it was easy to do goes on and on and makes the invention. But the fact is that the Merck index doesn't support that particular part of the sentence, and this is what Goldberg explained. So this wasn't something that he misunderstood. He quite clearly understood that the footnote doesn't refer to the 3.2. It refers to other parts of the sentence. This is like little pieces that they tried to pick apart in what Judge Goldberg did overall. What he did overall was look, he did what you're supposed to do. You look at all of the art, look for all of its teachings, and you look at the combinations of the art, and to find out if this would be easy to do or not. And the fact is that time and again, Judge Goldberg believed Dr. Kansenitis over Dr. Little, who was found to overemphasize certain things and to put too much emphasis on something else, and was ultimately discredited with respect to the balancing that is being done at the trial court level as to whether or not there's going to be a reasonable expectation of success that you're going to end up with this invention. And the fact is they don't like the result, but the fact is Judge Goldberg did exactly what he's supposed to do. But he also judged the credibility of the witnesses. He listened to all the testimony. He read all of the documents in this case, and he did the analysis he was supposed to do. And they take issue with it because they don't like the result, but the fact is there wasn't any legal error to be involved here. And to substitute at this stage, the credibility determinations, the factual determinations that Judge Goldberg brought to the trial and did this now, that would be uncalled for. I think that covered all of the different pieces that he had. The briefs have a stack of like eight or nine different things, and he went to a few of them. I think I've covered them all, but if the Court has any further questions. Thank you. Thank you. You've got a couple of minutes. Thank you, Your Honor. I'll be quick. On inventor testimony and written description, the testimony that counsel refers to had to do with the question, if you swapped out the preservative in the brand name eponid product with a single paraben, would it pass an AET test, which is an FDA test that they impose for approval? That was the question. It had nothing to do with written description. It had nothing to do with can you use it for purposes of this invention. It was focused on the brand product. I want to go back to Your Honor's point about Allen and the discussion of the Merck reference. So let's accept the statement in Allen on its face that a pH of three is where an alkyl is maximally stable. When you look at the data in Allen, it actually contradicts it because Dr. Constantinides said that the pH 4.7 to 4.8 formulation had better stability than the pH 3.7 in Allen itself. And there's other examples of that in the art. Look at the Cassis reference. A pH of three there led the formulation to crash in stability at 90 days. You compare that with the Nahata reference, which put an alkyl in water, pH 7.1. The stability of that formulation was actually better than the Cassis formulation. So even if there's that one statement, unsupported statement in Allen, there's data all over the prior art that teaches against it, that says that pH, it might be important, but there's other things going on here as well. Now I want to refer the court to tables A and B in the specification. This is where the patent shows that buffer concentration is indeed meaningful and important to stability. It compares different buffer concentrations at similar pHs, and it shows that buffer concentrations within the claimed range have better stability. So the court's point about how a pH of three would be the north star for any patent, often misses that point and ignores the buffer concentration limitation, which is important here as explained in the patent and is explained by Dr. Little at trial. He said that Dr. Little didn't have anything to say about buffer concentration. That's because Dr. Constantinides didn't provide any actual substantive testimony about it. He just, again, said calculated, reasonable, I'm sorry, routine experimentation, those generalities and conclusions. There's no evidence. There's no rationale regarding either motivation or reasonable expectation when it comes to buffer concentration. Okay. Thank you, Mr. Hunter. Thank you, counsel, the case is submitted.